# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

KENNETH WARD, GARY BRADLEY, JESSIE J.
THOMAS, SR., ERNEST COLEMAN, DAVID
McCULLOUGH, and SCOTT TABOH

Plaintiffs,

-vs-

MICHAEL RABIDEAU, JUAN A. CARMONA,
JOSE MELENDES, STEVEN KRUPPNER,
WILLIAM EVANS, MS. HOFFMAN, MR.
FRUGGIA, HOWARD DEAN, JOHN NUTTALL,
and W. GILBERT,

Defendants.

DECISION AND ORDER

04-CV-6488-CJS(F)

## APPEARANCES

For Plaintiffs:              David K. Hou, Esq.
                            Boylan, Brown, Code, Vigdor & Wilson, LLP
                            2400 Chase Square
                            Rochester, NY 14604
                            (585) 232-5300

For Defendants:             Benjamin A. Bruce, A.A.G.
                            New York State Office of the Attorney General
                            144 Exchange Boulevard, Suite 200
                            Rochester, NY 14614
                            (585) 327-3215

# INTRODUCTION

**Siragusa, J.** This is an action pursuant to 42 U.S.C. § 1983 in which Plaintiffs, all Jewish prison inmates at Groveland Correctional Facility ("Groveland"), contend that Defendants violated their rights under the First Amendment of the Constitution by failing to properly accommodate their religious needs. Now before the Court is Defendants' motion ([Docket No. 103](#)) for summary judgment. For the reasons that follow, the application is denied.

# BACKGROUND

The following facts are viewed in the light most favorable to Plaintiffs. During the time relevant to this lawsuit, Plaintiffs, who are all Jewish, were inmates at Groveland. New York Department of Correctional Services ("DOCS") Directive 4202 (Jun. 7, 2004) makes the Division of Ministerial and Family Services, which falls under the jurisdiction of the Deputy Commissioner for Program Services,

> responsible for ensuring that all religious programs and practices are carried out in accordance with the established tenets and practices of the faiths as well as the policies and procedures of the Department. For religions not represented by certified Chaplains, the Department will seek advice on matters of religious doctrine, practice and tradition from recognized religious authorities in the outside community. The Director of the Division reports to the Deputy Commissioner and is responsible for its day-to-day activities and the involvement of facility chaplains and their approved programs. Facility chaplains are responsible for carrying out all aspects of the religious programs of their respective faiths, including supervision of religious volunteers.

(DOCS Directive 4202 at 1.) The Directive also refers to Ministerial Program Coordinators ("MPC"), who are the liaisons between DOCS' Central Office and the chaplains, as well as other staff who serve the inmate population. (*Id*. at 2.) The Directive further provides that

"[e]ach MPC serves as a liaison from Central Office to a particular faith group on a statewide basis. The MPC must be a member of that faith." (*Id*.)

During the time relevant to this lawsuit, Groveland had a Coordinating Chaplain, the Reverend Juan Carmona ("Carmona"), who was also a Protestant chaplain. (Carmona Dep. 188:2–3.) According to Directive 4202, the Coordinating Chaplain serves "as the principal adviser to the Superintendent on religious programs and practices and is responsible for planning the overall religious program, in collaboration with all other chaplains assigned to the facility, which satisfies the intent of this Directive." (DOCS Directive 4202 at 2.)

In 2003, Defendants eliminated the MPC position for the Jewish faith based on the recommendation of John Nuttall, Deputy Commissioner for Program Services ("Nutall"). (Ward Aff. ¶ 21 & Ex. J.) In addition, Groveland had no regular rabbi at the facility from 2003 through 2005. Thus, the responsibility for seeing to the needs of the Jewish inmates fell to Carmona and Deputy Superintendent for Programs at Groveland, who, during 2004, was Jose Melendez. Jewish religious dietary needs were overseen by Howard Dean, DOCS Director for Nutritional Services ("Dean"). None of these three defendants had specific knowledge or training with regard to the religious needs or dietary requirements for Jewish inmates.

Plaintiffs assert that as of February 2004, Carmona failed to allow for, schedule or otherwise provide for Jewish services at Groveland, and that, further, there were no religious study materials were then available. After Plaintiffs made requests for Jewish services, they were permitted, but Plaintiffs still had no assistance in obtaining the services of a rabbi or in obtaining religious materials, such as a Torah. However, in late 2004,

purchase orders were issued to obtain Jewish religious materials for use in the inmates' lay services. Plaintiffs also complain that defendant William Gilbert searched the inmates participating in lay Jewish services as they entered the activity room, and would not permit them to retain some of their religious study materials, citing security concerns. (Ward Aff. ¶ 18.)

With regard to their dietary needs, Plaintiffs contend that they were served the cold alternative diet at Groveland, but on occasions were served the same non-kosher meals provided to the general inmate population. (Ward Aff. ¶¶ 23-34.) Plaintiffs also state that Defendants "on numerous occasions [failed] to provide for adequate, and edible, proper kosher meals or allow for proper observances for Purim, Passover, Rosh Hashanah and Yom Kippur, as set forth in the Verified Complaint." (Ward Aff. ¶ 23.) On a number of occasions, Plaintiffs state that the cold alternative diet meal was not kosher, or was not prepared according to kosher requirements, or both. Additionally, Plaintiffs complain that at times the meals were missing food, or had inedible frozen or spoiled items, or lacked proper utensils. Moreover, Plaintiffs maintain that when they refused to eat the cold alternative diet meals for what they claim were religious reasons, they were removed from that meal plan, leaving them with no kosher meal alternative. Plaintiffs filed complaints with Defendants, including Dean, but none of their complaints was satisfactorily resolved. (Ward Aff. ¶ 28.)

Finally, Plaintiffs also state that they were the subjects of harassment and discriminatory remarks by Groveland staff, including Defendants, as a result of their religious-based objections and repeated grievances. (Compl. ¶¶ 18-22.) They also contend that Defendants segregated them at meal times by compelling them to sit at a table

designated as "Jewish Inmates Only," and that Defendants threatened disciplinary sanctions if they refused to sit there. (Compl. ¶ 29.) In contrast, Plaintiffs state that no other religious group received similar treatment.

## STANDARDS OF LAW

### *Summary Judgment*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249; *see*

*also*, Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, and adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed. R. Civ. P. 56(e). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).

### 42 U.S.C. § 1983

Plaintiffs are suing in this action pursuant to 42 U.S.C. § 1983, and the legal principles applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. *See, e.g., Monroe v. Pape*, 365 U.S. 167(1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977).

> \* \* \*

> An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. *See Black v. Coughlin*, 76 F.3d

72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free School Dist.*, 365 F.3d 107, 122, 127 (2d Cir. 2004).

### First Amendment Free Exercise Clause

The Supreme Court evaluates a prison's infringement on a prisoner's free exercise right using four factors:

when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. In our view, such a standard is necessary if "prison administrators…, and not the courts, [are] to make the difficult judgments concerning institutional operations." J*ones v. North Carolina Prisoners' Union*, 433 U.S., at 128. Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration. The rule would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration." *Procunier v. Martinez*, 416 U.S., at 407.

As our opinions in *Pell*, *Bell*, and *Jones* show, several factors are relevant in determining the reasonableness of the regulation at issue. First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it. *Block v. Rutherford*, *supra*, at 586. Thus, a regulation cannot be sustained where the logical

connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one. We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression. *See Pell v. Procunier*, 417 U.S., at 828; *Bell v. Wolfish*, 441 U.S., at 551.

A second factor relevant in determining the reasonableness of a prison restriction, as *Pell* shows, is whether there are alternative means of exercising the right that remain open to prison inmates. Where "other avenues" remain available for the exercise of the asserted right, *see Jones v. North Carolina Prisoners' Union*, *supra*, at 131, courts should be particularly conscious of the "measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Pell v. Procunier*, *supra*, at 827.

A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials. *Cf. Jones v. North Carolina Prisoners' Union*, *supra*, at 132-133.

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. *See Block v. Rutherford*, 468 U.S., at 587. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. *See ibid*. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Turner v. Safley*, 482 U.S. 78, 90-91 (1987).

**ANALYSIS**

***Personal Involvement of Nuttall and Dean***

Defendants' first argument is that Plaintiffs have failed to show that either Nuttall or Dean was directly responsible for the actions or omissions alleged in the complaint. (Def.s' Mem. of Law 6.) Nuttall argues that he is not personally involved in the investigation of inmate complaints, or hiring of rabbis for any DOCS facility. Furthermore, Nuttall maintains that he would not typically see inmate letters about conditions at a particular facility, since those tasks are handled by Mark Leonard, Director of Ministerial Services, who prepares responses for Nuttall's signature. (Nuttall Dep. 24-25, 28, 30-32.) As for Dean, he contends that it is the regional coordinators, not him, who investigate complaints about specific facilities. (Dean Dep. 34, 61.)

Plaintiffs counter that the June 22, 2004, letter (Ward Aff. Ex. J) which Kenneth Ward ("Ward") sent to Nuttall outlined in detail the issues regarding the kosher food and the lack of a rabbi and Jewish religious materials. (Ward Aff. ¶ 35 & Ex. J.) Additionally, they point out that Nuttall testified at his deposition that the Commissioner made the decision to eliminate the MPC for Jewish inmates at Groveland on his recommendation. (Nuttall Dep. 12.) On this point, Plaintiffs contend that the lack of a Jewish MPC "contributed to, and compounded, Defendants' actions which violated Plaintiffs' exercise of their religion." (Pl.'s Mem. of Law 6.) With regard to Dean, Plaintiffs assert that Ward's June 22, 2004, letter[1] was also sent to Dean and that not only did Dean respond to the

---

[1]Ward addressed the letter to the Director of Ministerial and Family Services and opened it with, "Dear Director of Nutritional [sic] Services." (Ward Aff. Ex. K, at 1.) The letter itself does not contain any indication that it was copied to Dean.

letter, "he also personally assured [Ward] that the Cold Alternative Diet was sufficient." (Pl.'s Mem. of Law 6; Ward Aff. ¶ 36 & Ex. K.)

Turning first to Dean, his response letter reads in pertinent part as follows: "The Regional Coordinator investigated your concerns. It was determined that Groveland Correctional Facility is following all procedures concerning your cold alterative diet. The Offices of Ministerial Services and Nutritional Services have approved the policy and procedure for this diet program." (Howard Dean letter to Kenneth Ward, Aug. 9, 2004, Ward Aff. Ex. K, at 1.)

Generally, the receipt of a letter is insufficient to establish personal involvement under § 1983. *See, e.g., Petty v. Goord*, No. 00 Civ. 803 (MBM), 2002 U.S. Dist. LEXIS 21197, 2002 WL 31458240 at *8 (S.D.N.Y. Nov. 4, 2002) (Mukasey, J.) ("[C]ourts in this Circuit, applying the principles laid out in *Colon* [*v. Coughlin*, 58 F.3d 865 (2d Cir. 1995)], have agreed that receiving a letter from an inmate does not constitute sufficient personal involvement to generate supervisory liability."); *accord, Barclay v. Poland*, No. 03CV6585CJS (FE), 2006 U.S. Dist. LEXIS 1582, 2006 WL 145552 (W.D.N.Y. Jan. 19, 2006) (Siragusa, J.). Instead, courts typically require something more before finding personal involvement. *See, e.g., Rivera v. Pataki*, No. 04 Civ. 1286(MBM), 2005 U.S. Dist. LEXIS 2747, 2005 WL 407710 at *23 (S.D.N.Y. Feb. 7, 2005) (Mukasey, J.) (quoting *Johnson v. Wright*, 234 F. Supp. 2d 352, 363-64 (S.D.N.Y.2002)) ("[P]ersonal involvement will be found…where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint.") However, there is no *per se* rule in this regard. *See, Suarez v. Keiser*, No. 04-CV-6362 CJS, 2006 U.S. Dist. LEXIS 11986, 2006 WL 543725 at *6 (W.D.N.Y. Mar. 3, 2006) ("Such situations must be

evaluated on a case-by-case basis. That is, the details of an inmate's letter might trigger a particular supervisor's duty to investigate or to take some action, or it might not.")

In this case, the Court determines that Plaintiffs' letter, a copy of which was evidently sent to Dean, caused him to pursue an investigation through the regional coordinator. Ward's letter detailed his complaint about the cold alternative diet and petitioned for "a nutritionally adequate alternative meal regimen consist[e]nt with [his] religious beliefs, which should include at least one <u>hot</u> meal per day." (Kenneth Ward letter to Director of Ministerial and Family Services, Jul. 20, 2004, Ward Aff. Ex. K at 1 (emphasis in original).) In this regard, Dean testified at a deposition that,

> I have regional coordinators that I supervise directly, that currently oversee or supervise facilities, and they are kind of my eyes, as I don't go to every facility in the state anymore physically. So these people do my footwork for me. And then they respond back with any problems, and I relate the problems to the executive at the facility to see if corrective action needs to be taken (Dean Dep. 34)....

> We have statewide menus that are developed in my office with a team of food service people and nutritionists. And that statewide menu is utilized in all 70 correctional facilities (Dean Dep. 36)....

In response to the question, "[f]or a religious group like the Jewish faith, who has a Passover meal, for example, does your office issue what the Passover menu items might be for that given year?" Dean said,

> Yes, we have a separate Passover menu for the—I think it's seven or eight days of Passover, and that is generated through our office and distributed to all facilities, and the food is provided through the department for that....

> I don't recall having any communications over this Complaint until after I got the Complaint. I did reach out to Ms. Lembardo[2] to see if she had any recollection of what had happened, and at that time she did not either. (Dean Dep., at 48)….
>
> If it's something above the normal, I get involved, but otherwise a fellow by the name of Mr. Schattinger handles all grievances [pertaining to food].

(Dean Dep. 50). Dean's argument that he was not personally involved in this issue of policy concerning food for Jewish inmates at Groveland is belied by his testimony. Dean set the kosher menus throughout DOCS and, thus, was personally involved. Though he had subordinates as his eyes and ears, it appears from his testimony that those subordinates reported back to Dean who, at least in this case, personally responded to Ward's letter complaining about the kosher meals at Groveland. Dean must, therefore, remain as a defendant.

Regarding Nuttall, it is undisputed that as DOCS Deputy Commissioner for Program Services, he was involved in the decision to eliminate the MPC for Jewish inmates at Groveland, and that he received Ward's detailed letter of complaint, dated June 22, 2004, and responded to it saying, "the Department of Correctional Services is currently in the process of hiring a Rabbi to serve at Groveland. That person will directly assist you and other Jewish inmates with religious practices." (Ward Aff. Ex. J, at 3.) In Nuttall's situation, his personal involvement is less clear than in Dean's case. The district court's decision in *Johnson v. Wright*, 234 F. Supp. 2d 352 (S.D.N.Y. 2002) is instructive. There, the court wrote:

---

[2]Ivy Lembardo was the regional supervisor at Groveland for approximately three years at the time of Dean's deposition testimony. (Dean Dep. 46.) Unfortunately, the deposition transcript does not contain a date.

Personal involvement will be found, however, where a supervisory official receives and acts on a prisoner's grievance or otherwise reviews and responds to a prisoner's complaint. *See, e.g., Ramos v. Artuz*, 2001 U.S. Dist. LEXIS 10327, 2001 WL 840131, at *8-*10 (S.D.N.Y. July 25, 2001) (personal liability where prison official "sent plaintiff numerous letters containing some explanation or justification concerning the issues raised by plaintiff"); *cf. Johnson v. Bendheim*, 2001 U.S. Dist. LEXIS 9679, 2001 WL 799569, at *6 (S.D.N.Y. July 13, 2001) (motion to dismiss denied as to prison official who received prisoners' grievances and denied them); *James v. Artuz*, 1994 U.S. Dist. LEXIS 5708, 1994 WL 174005, at *7 (S.D.N.Y. May 4, 1994) (denying summary judgment where a prison official conducted a *de novo* review of a prison disciplinary hearing); *Van Pelt v. Finn*, 1993 U.S. Dist. LEXIS 15951, 1993 WL 465297, at *6 (S.D.N.Y. Nov. 12, 1993) (prison official demonstrated personal involvement when he reviewed plaintiff's grievances).

*Johnson*, 234 F. Supp. 2d 363-64. Viewing the evidence in the light most favorable to the non-moving party, the Court determines that there is an issue of fact as to whether Nuttall was personally involved, and he must, therefore, also remain as a defendant.

### Plaintiffs McCullough and Thomas and Exhaustion

Defendants next argue that plaintiffs David McCullough ("McCullough") and Jessie J. Thomas ("Thomas") failed to exhaust administrative remedies, a prerequisite to a prisoner lawsuit under § 1983, and their claims must be dismissed (Def.s' Mem. of Law 8). McCullough and Thomas respond that "they were justified in filing grievances[,] or, in the alternative, Defendants are estopped from raising the defense of failure to exhaust administrative remedies." (Pl.s' Mem. of Law 8.)

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a) (2007) requires exhaustion of "all inmate suits about prison life, whether they involve general circum-stances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). As Plaintiffs point out, however, there

are exceptions to the exhaustion requirement. First, Defendants concede that Thomas did file a grievance, but they contend that he did not appeal the denial of his grievance to the final authority, the Central Office Review Committee ("CORC") in Albany, New York. (Def.s' Mem. of Law 11.) McCullough, though, did not file a grievance. In this regard, McCullough testified at his deposition that, "I didn't personally file a grievance [regarding Jewish religious services or kosher food], Mr. Ward filed a grievance, but I was one of his witnesses because I attended services with him." (McCullough Dep. 64.)

Both Thomas and McCullough contend that the exceptions discussed in *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004) and *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), should apply to them. The plaintiff in *Hemphill* was successful in his argument that prison officials used verbal and physical threats to effectively prevent him from exhausting administrative remedies. There, the Second Circuit wrote,

> And, like an inmate claiming retaliation, Hemphill "should have the opportunity to develop facts that would demonstrate that [defendants' actions] would deter a reasonable inmate from pursuing grievances." *Id*. at 354 (internal quotation marks and citation omitted).n8
>
>> n8 The consequences of finding a justification (based on threats) for failing to file an ordinary grievance are different from those of a finding that threats rendered ordinary grievance procedures unavailable. The latter automatically means that the PLRA requirements have been met. The former results in the rather more complicated "conditional" decree we issued in *Giano*. It seems likely, therefore, that facts sufficient to support a conclusion that an inmate was "justified" in not following ordinary procedures will be less powerful than those which would lead to a holding that those procedures were not available. Because we need not decide that question at this time, however, we do not do so.

*Hemphill*, 380 F.3d at 690 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). In

*Giano,* the Second Circuit stated, "'special circumstances'" may excuse a prisoner's failure to exhaust, but dismissal with prejudice, when remedies are no longer available, is required "in the absence of any justification for not pursuing [such] remedies." *Giano*, 366 F.3d at 87-88 (quoting *Berry v. Kerik*, 366 F.3d 85, 87-88 (2d Cir. 2004)) (other citations omitted).

McCullough alleges in his affidavit opposing the present motion, "[s]pecifically, we feared retaliatory conduct in the form of unnecessary and harassing frisk searches, urine testing, misbehavior tickets and reports. Therefore, Defendants' own conduct prevented the Jewish inmates from filing any otherwise unfiled but required grievances, if any." (McCullough Aff. ¶ 5.) Similarly, Thomas contends in his affidavit, "we feared retaliatory conduct in the form of unnecessary and harassing frisk searches, urine testing, tier three misbehavior tickets and reports. Therefore, Defendants' own conduct prevented the Jewish inmates from filing any otherwise un-filed but required grievances, if any." (Thomas Aff. ¶ 6.) The verified complaint contains this statement: "The situation has escalated to the point that many of the Jewish/Hebrew inmates are afraid that any additional grievances submitted will be rewarded by additional hardships, possibly including transfers, harassment in the form of unwarranted Tier II tickets, urinalysis testing, unneeded cube 'frisks' or other undue punishment." (Compl. 18.)[3] Accordingly, the Court finds that the evidence raises a question of fact precluding summary judgment with regard to the exhaustion issue.

### Correctional Officer W. Gilbert

Defendants assert that Correctional Officer W. Gilbert ("Gilbert") did not violate Plaintiffs' First Amendment rights when he searched Plaintiffs before they were allowed to

---

[3]Ths page number is taken from the electronic version of the complaint. The number written on the actual page is 5(h).

participate in religious services. Defendants contend that because the Jewish inmates did not have clergy meeting with them, Gilbert was justified in searching them to prevent the introduction of contraband and inappropriate religious materials into the meeting room. (Def.s' Mem. of Law, at 12.) Gilbert testified about his practice as follows:

> The services were inmate run, no clergy was overseeing them. [My area supervisor, Sgt. Mike Polick,] requested or had me check the items coming in. I briefly check them for possible contraband, as I do any items coming in my building. I did write down the inmate[']s name, number, and whatever the religious article, book, whatever it was. The reasoning was Sgt. Polick wanted to track what is coming in to make sure it was appropriate for a Jewish service.

(Gilbert Dep., at 176.) Plaintiffs assert that no other religious group was so treated. Gilbert, however, was asked about that, and testified as follows:

> Q. Were you asked to—Were there any other religious services that you were asked to engage in similar activity?
>
> A. Writing the items down, keeping track, no, frisking, yes.
>
> Q. And for what other services?
>
> A. Both [sic] the Muslim, Protestant, and Catholics.
>
> Q. Do you know why you did the frisking but not the logging of items?
>
> A. I was never told to do any other religion.
>
> Q. Do you know why that was?
>
> A. No idea.

(Gilbert Dep., at 177-78.) In addition to the search issue, Plaintiffs also maintain that Gilbert ordered them to sit at a table with a large sign that read "Jewish Inmates Only," and threatened disciplinary action if they refused. Gilbert, though, testified that he had no

involvement in setting up that table and was merely one of the corrections officer on duty at the mess hall. (Gilbert Dep., at 182.) He also denied ever hearing of any complaints of an anti-Semitic nature. (*Id.*, at 183.) Viewing the evidence in the light most favorable to the non-moving parties, the Court finds that material questions of fact preclude summary judgment for Gilbert.

### Cold Alternative Meal

Defendants next contend that the cold alternative meal did not violate Plaintiffs' constitutional rights under the First Amendment. In order to succeed on a religious liberty claim, Plaintiffs must demonstrate "that the disputed conduct substantially burdens [their] sincerely held religious beliefs." *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006). As the Second Circuit noted in *McEachin v. McGuinnis*, 357 F.3d 197 (2d Cir. 2004),

> courts have generally found that to deny prison inmates the provision of food that satisfies the dictates of their faith does unconstitutionally burden their free exercise rights. This principle was established in our circuit at least as early as 1975. *See Ford* [*v. McGinnis*], 352 F.3d [582] at 597 [(2003)] (holding that prisoners have a "clearly established" right "to a diet consistent with [their] religious scruples"); *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992) (*per curiam*) (reaffirming *Kahane v. Carlson*, 527 F.2d 492, 495 (2d Cir. 1975) (finding that Orthodox Jewish inmate had right to provision of kosher meals)).

*McEachin v. McGuinnis*, 357 F.3d at 203 (footnote omitted). Here, Defendants do not dispute[4] that a kosher diet is central to the Jewish faith. *See Johnson v. Horn*, 150 F.3d 276, 279 (3d Cir. 1998) ("According to the affidavit of Rabbi Dr. Baruch A. Poupko, the laws of kosher are 'categorically binding upon every Jewish man and woman.' JA at 64."). Instead, Defendants contend that Plaintiffs have not submitted any evidence in support of

---

[4]Also not at issue is the sincerity of Plaintiffs' beliefs.

their conclusory assertions that the cold alternative diet violates Jewish religious laws. (Def.s' Mem. of Law, at 12-13.) In his letter to Food Service Administrator II William Evans, dated September 20, 2004 (Compl. Ex. T), Ward specified the violations he observed in the preparation of his meal. Morevoer, in his affidavit submitted in connection with the subject application, he asserts that "the meals were in direct violation of GCF's Cold Alternative Diet guidelines and procedures" (Ward Aff. ¶ 25), and he provides the following details:

> 26. Specifically, the food - fruit, vegetables, meats, cheeses and/or milk - was often found at various times to be frozen, rotten, spoiled or otherwise inedible. It is disingenuous for Defendants to contend that kosher food that is inherently inedible is adequate or kosher. In addition, nearly every day various items, such as tuna fish, pudding, meat, cheese or fruit—sometimes two per day—were missing from the Cold Alternative Diet meals.

> 27. Similarly, Defendants failed to properly prepare our meals in accordance with kosher requirements. Generally, there are specific rules that dictate separate utensils and other items for kosher and non-kosher foods and containers. Despite the fact that these containers, plates and utensils were present and available at GCF, Defendants failed to prepare our meals appropriately. For example, milk was supposed to be served in its own carton marked with a "I" for "kosher." However, Defendants served the milk out of Styrofoam cups or other containers intended for the general population, thus making it non-kosher. Furthermore, there exist numerous other examples of improper preparation, including the cooking of food served to the Jewish population in general population pots and pans, the service of food to Jewish inmates on general population trays, and the service of beverages to Jewish inmates through the general population cooler.

(Ward Aff. ¶¶ 26-27.) The Court determines that Plaintiffs have raised material issues of fact which preclude summary judgment on this point.

### *Qualified immunity*

The Second Circuit addressed the defense of qualified immunity in *Ayers v. Ryan*,

152 F.3d 77 (2d Cir. 1998), writing:

> Qualified immunity shields government officials from liability for damages resulting from the performance of discretionary official functions if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rodriguez v. Phillips*, 66 F.3d 470, 475 (2d Cir. 1995) (internal quotation marks omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Summary judgment may be granted on this ground if the defendant shows that (1) the asserted right was not clearly established, or (2) it was nonetheless objectively reasonable for the official to believe the conduct did not violate it. 66 F.3d at 475. To win summary judgment on the latter ground, the official "must produce such uncontroverted facts that a jury—drawing all inferences favorable to plaintiff—would have to conclude it was objectively reasonable for defendant to believe his actions did not violate an established federally protected right." *Id*.

*Ayers v. Ryan*, 152 F.3d 77, 82 (2d Cir. N.Y. 1998). On this point, Defendants argue that:

> The defendants are entitled to qualified immunity concerning the quality of the food served in the Cold Alternative program. No defendant could reasonably expect that the occasional failure to include a menu item for an inmate or the failure to identify blemished fruit or cheese would result in a violation of plaintiffs' constitutional rights. As stated above, plaintiffs without any evidence, allege that any food that they deem low quality is also not Kosher.

> Plaintiff's right to receive more than the Cold Alternative Meal has not been clearly established thus the defendants are entitled qualified immunity and the claims concerning the Cold Alternative Meal should be dismissed.

(Def.s' Mem. of Law 15.)

In *Ashcroft v. Iqbal*, the Supreme Court held that, "[w]here the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1948 (2009) (citations omitted). In *Iqbal*, the plaintiff claimed he was discriminated against by prison officials because of

his race, religion, or national origin (a Muslim Pakistani citizen arrested after the attacks on the United States of September 11, 2001). The Supreme Court discussed the issue of qualified immunity, which was the basis for the Second Circuit's dismissal of Iqbal's complaint, and wrote:

> The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue. Where the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose.… It instead involves a decisionmaker's undertaking a course of action "'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Ibid*. It follows that, to state a claim based on a violation of a clearly established right, respondent must plead sufficient factual matter to show that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin.

*Iqbal*, 129 S. Ct. at 1948–49. Although *Iqbal* dealt with a lawsuit against federal officials, the rationale is equally applicable to a lawsuit, as here, against state officials. The Court reads *Iqbal* as requiring a plaintiff at the summary judgment stage to either prove that the allegedly discriminatory conduct was undertaken because of its adverse effects upon him, and not merely for neutral reasons, or for legitimate penological reasons. *See, also, Turner v. Safley*, 482 U.S. 78, 89 (1987)[5] ("when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.").

Here, the evidentiary proof shows that at unspecified times, Plaintiffs were served spoiled food, or food not prepared or served in accordance with kosher laws or DOCS

---

[5]Plaintiffs do not make any claims under the Religious Freedom Restoration Act of 1993, which applies a different standard than the one specified under *Turner*. *Jolly v. Coughlin*, 76 F.3d 468, 474–75 (2d Cir. 1996).

directives. Plaintiffs contend that their complaints about the food were addressed by Defendants only by having all Jewish inmates seated at a table identified as "Jewish Inmates Only." Although the Court agrees that the right to a kosher meal other than the cold alternative meal has not been constitutionally established, "[a]t least as early as 1975, it was established that prison officials must provide a prisoner a diet that is consistent with his religious scruples. *See Kahane v. Carlson*, 527 F.2d 492 (2d Cir. 1975). *Kahane* has never been overruled and remains the law." *Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992); *accord Jackson v. Mann*, 196 F.3d 316, 321 (2d Cir. 1999) (a prison inmate is entitled to receive "a diet that is consistent with his religious scruples." (quoting *Bass*).). Defendants' alleged segregation of Jewish inmates as the only response to complaints about the quality and kosher nature of the food served to the Jewish inmates, raises a material issue of fact as to whether Defendants acted because of the action's adverse impact on Jewish inmates, rather than in spite of the impact. Accordingly, the Court cannot determined whether Defendants are entitled to qualified immunity until this issue of fact is resolved.

### *Reasonable accommodations*

The Supreme Court in *Turner* set forth four factors to consider in determining the reasonableness of the state's acts that impact on a prisoner's religious freedom:

> First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it. *Block v. Rutherford*, [468 U.S. 576] *supra*, at 586 [(1984)]. Thus, a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one. We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion,

without regard to the content of the expression. *See Pell v. Procunier*, 417 U.S. [817], at 828 [(1974)]; *Bell v. Wolfish*, 441 U.S. [520], at 551 [(1979)].

A second factor relevant in determining the reasonableness of a prison restriction, as *Pell* shows, is whether there are alternative means of exercising the right that remain open to prison inmates. Where "other avenues" remain available for the exercise of the asserted right, *see Jones v. North Carolina Prisoners' Union*, [433 U.S. 119] *supra*, at 131 [(1977)], courts should be particularly conscious of the "measure of judicial deference owed to corrections officials…in gauging the validity of the regulation." *Pell v. Procunier*, *supra*, at 827.

A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally. In the necessarily closed environment of the correctional institution, few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order. When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials. *Cf. Jones v. North Carolina Prisoners' Union*, *supra*, at 132-133.

Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation. *See Block v. Rutherford*, 468 U.S. [576], at 587 [(1984)]. By the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. This is not a "least restrictive alternative" test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint. *See ibid*. But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Turner*, 482 U.S. at 89–91. With respect to the *Turner* case, Defendants here address only the reasonableness of not providing a rabbi or religious materials. Accordingly, the Court need only address Defendants' argument as it pertains to a rabbi and religious materials, and not as it pertains to the question of kosher meals.

Defendants' evidentiary proof shows that the MPC position was eliminated in 2003 after Rabbi Morganstern retired because, "[t]he feeling was that the number of Jewish inmates was so small that it really didn't warrant a full ministerial program coordinator." (Nuttall Dep. 9:12–15; *see also* 9:22–24, 10:14–18.) At the time, Nuttall testified that the prison population in New York had approximately 900 to 1,000 Jewish inmates, whereas at the time of his deposition in 2007, it was approximately 3,300 Jewish inmates, out of a total population of approximately 63,800. (Nutall Dep. 13:6–18.) The elimination of the position was evidently a budgetary decision. (Nutall Dep. at 10–11.) Plaintiffs point out that Defendants eliminated the Jewish MPC position, which provided a liaison between DOCS and the Jewish faith community, while at the same time Groveland was without a rabbi, or Jewish religious materials. Plaintiffs also point to the absence of evidence of any attempts by Defendants to obtain a rabbi. (*See, e.g.*, Melendez Dep. 159:7–13 ("Q. Do you have any knowledge of the efforts made by Mr. Leonard[6] with regard to either getting approval to hire a rabbi or to have approval for the budget for the rabbi? A. All I know is that when I spoke to Mark Leonard several times, he said that he was still trying to get a rabbi to help us, and that never came.").)

Plaintiffs argue that,

Defendants' explanation is really no explanation at all; they offer no evidence whatsoever to support their conclusion, other than hearsay statements by Mark Leonard. The record is devoid of any memorialized attempt (or failure) to retain a rabbi for Plaintiffs, or, failing that, advising Plaintiffs what alternatives were available to them. For example, Defendants fail to offer a list of candidates considered, or any communications sent to or received from rabbis, temples or other organizations. In the absences of any such

_____

[6]Mark Leonard, director of ministerial services. (Carmona Dep. 190:5–7.)

proof, questions of fact exist which warrant denial of Defendants' motion. If Defendants' paltry explanation for their failure is sufficient as a matter of law, the analysis established by *Turner* would be rendered meaningless.

(Pl.s' Mem. of Law 17.) Defendants counter that,

> As to the Second factor, plaintiffs were able to practice their faith in ways other than clergy led worship services. The record shows that plaintiffs were permitted to hold weekly worship services (Plaintiffs' Deposition pp. 11-12). Rev. Carmona did not participate in the services but were instead led by Jewish inmates; (Defendants' Deposition p. 199). In May 2004, Torahs were provided to plaintiffs for use during worship services (Plaintiffs' Deposition p. 15). In addition to the weekly Jewish Worship services, Jewish holidays were celebrated about six times per year (Plaintiffs' Deposition p. 84) and Lubavitch Rabbis visited the Jewish inmates at Groveland (Plaintiffs' Deposition p. 82; Defendants' Deposition p. 154). Rev. Carmona also provided individual counseling for Jewish inmates (Defendants' Deposition p. 192). In light of the substantial alternatives to clergy led worship, the lack of a Jewish clergy did not deny the plaintiffs a reasonable opportunity exercise their faith.

(Def.s' Mem. of Law 17.) Ward contends in his affidavit (Docket No. 112) that when he first arrived at Groveland, no rabbi was available, and that when he attempted to contact rabbis outside the correctional facility, he was told that if he did so, it would result in a misbehavior report. (Ward Aff. ¶ 9.) He made several requests to Defendants to provide a rabbi without result. Further, although Defendants stated that rabbis visited Groveland, Ward contends that they only visited the facility on a few Jewish holidays. (*Id*.) Ward notes that by operation of the facility's rules, the responsibility for providing for Jewish inmates' religious needs fell to Carmona. (Ward Aff. ¶ 10.) Ward further states, "although Defendants offered a variety of regular worship services and religious study materials to members of the Protestant, Catholic and Islamic faiths, there were no religious services or materials for Jewish inmates." (*Id*. ¶ 11.) Ward contends further that,

[i]t was only after much prodding by myself and other Jewish inmates that Defendants permitted Plaintiffs some opportunity for regular religious worship and study; even this was deficient, however. These "worship services" lacked any regularity of formal leadership whatsoever; Defendant Carrnona did not lead them—rather, individual Jewish inmates, neither trained nor in any way qualified to lead a Jewish worship service, were left to "lead" the services without any guidance or instruction whatsoever. Because [Groveland] lacked any meaningful leadership for Jewish inmates, I sought to establish a regular "study group" for Jewish inmates, but Defendant Carmona denied these requests as well.

(Ward Aff. ¶ 12.) Defendants argue that,

Defendant Jose Melendez was the Deputy Superintendent for Programs at Groveland during 2004. He made several requests to Mark Leonard to have a Rabbi assigned to Groveland and worked with Jewish resources in the community to meet the needs of the Groveland Jewish population in the absence of a Rabbi (Defendants' Deposition p. 155).

(Def.s' Mem. of Law 16.) The deposition page cited contains the following:

Q. I understand that D.O.C.S. had a Jewish MPC. You know what an MPC is?

A. Yes.

Q. By the name of Arthur Morganstern?

A. Yes.

Q. And he retired in 2003, and his position was eliminated?

A. I am not exactly certain of when he retired. I know that he did retire, and I know his position was eliminated.

Q. Did that affect how you dealt with religious issues for Jewish inmates?

A. Only to the degree that since we did not have that source from Rabbi Morganstern, we would have to seek the Lubavitch in order to get help to help us out. And on numerous occasions I contacted our ministerial services directly in central office to request that we be assigned a rabbi to help us out

in all areas to meet their needs specific needs.

Q. And who is that person?

A. Mark Leonard.

Q. And how many times do you recall contacting him?

A. Several times. I can tell you the exact number of times.

(Melendez Dep. 155.) This deposition testimony, though, does not show how Defendants acted to create an alternative means for Jewish prisoners to worship. Mr. Leonard's efforts are not documented in admissible form, since only hearsay is presented with regard to his actions. At deposition, Plaintiffs' counsel asked Carmona the following questions and received the following answers:

Q. And is there currently a rabbi assigned to Groveland?

A. No.

Q. Do you know why that is?

A. I take it that the Board of Rabbis has not found anyone that they can assign any rabbi that would be willing to come here and take an assignment for Groveland and Livingston.

(Carmona Dep. 208:8–15.) From this testimony, Defendants contend that,

The Board of Rabbis is responsible for finding a replacement Rabbi but could find anyone willing to go to Groveland and Livingston Correctional facilities (Defendants Deposition p. 208 ln 12-15). The defendants made reasonable efforts to locate a Rabbi and to provide assistance to the plaintiffs in the practice of their faith which were sufficient to satisfy the first *Turner* factor.

(Def.s' Mem. of Law 16–17.) However, it does not follow that simply because the coordinating chaplain speculates that the Board of Rabbis had not found a rabbi for Groveland, the

Board of Rabbis is responsible for that task, or that Defendants expended reasonable efforts to provide either a rabbi or a reasonable alternative for Jewish worship at Groveland.

The Court is aware that where "other avenues" remain available for the exercise of the asserted right, it should be particularly conscious of the "measure of judicial deference owed to corrections officials…in gauging the validity of the regulation." *Pell v. Procunier*, 417 U.S. at 828. As to this direction, the Court has found little guidance in Second Circuit case law. However, in *Graham v. Coughlin*, No. 86 Civ. 163(WK), 2000 WL 1473723, *6 (S.D.N.Y. Sept. 29, 2000), the district court wrote:

> the First Amendment does not compel that the prison provide inmates with the spiritual counselors of their choice. The State need merely afford each prisoner a reasonable opportunity to worship. *Johnson v. Moore* (9th Cir. 1991) 948 F.2d 517, 520. In *Johnson*, the inmate was not provided with a Unitarian Universalist minister. The Ninth Circuit held that the inmate did not show that his lack of access to a minister deprived him of a reasonable opportunity to exercise his faith.

The Ninth Circuit also addressed this issue in a 1993 decision in which that court wrote:

> Ward has requested that the prison provide him with an Orthodox rabbi. Since Ward is the only Orthodox Jewish prisoner in the institution, the prison does not have a rabbi on staff. It is not clear whether the prison made any effort to contact an Orthodox rabbi on Ward's behalf; however, a prison official testified that there were no Orthodox Jewish rabbis within a one hundred mile radius of the prison. No rabbi has volunteered to come to the prison. The prison, however, in no way restricts Ward's ability to contact a rabbi on his own to come into the prison, nor does it forbid rabbis from coming into the prison. Thus, the issue here is whether the prison has an affirmative obligation to provide a rabbi for Ward.
>
> We have previously held that prison officials have no such obligation. In *Allen v. Toombs*, 827 F.2d 563, 569 (9th Cir. 1987), we concluded that a "prison administration is not under an affirmative duty to provide each inmate with the spiritual counselor of his choice." *Accord Cruz v. Beto*, 405 U.S. 319,

322 n. 2 (1972) (*dicta*). Thus, the prison has not infringed upon Ward's right to free exercise by not providing a rabbi.

*Ward v. Walsh*, 1 F.3d 873, 880 (9th Cir. 1993). Further still, the Eastern District of California addressed a case in which a prisoner claimed a First Amendment right to be provided with a Wiccan chaplain. In recommending that summary judgment be granted to the defendants, the magistrate judge wrote:

> Because prison officials are not required to provide each inmate with the spiritual counselor of his or her choice, and because CCWF provides Plaintiffs with opportunities for worship, education and counseling from a volunteer Wiccan chaplain, the Equal Protection clause is not violated. *Allen*, 827 F.2d at 568-69. *See also Gittelmacker*, 428 F.2d at 4 (satisfying the Equal Protection clause requires only a good faith accommodation of an inmate's rights in light of practical considerations).

Findings and Recommendations, *Hartmann v. California Dept. of Corrections and Rehabilitation*, No. 1:10-CV-00045-LJO-SMS, 2010 WL 1729757, *13 (E.D. Cal. Mar. 15, 2010), *adopted by Hartmann v. California Dept. of Corrections and Rehabilitation*, 2010 WL 1702323, *1 (E.D. Cal. Apr. 23, 2010) ("IT IS HEREBY ORDERED that the Findings and Recommendations, filed March 15, 2010, are adopted in full.").

Guided by the cases cited above, the Court concludes that the Constitution does not compel DOCS to provide a Jewish chaplain, as long as it makes available an alternate means of worship. Here, Ward stated that Jewish inmates were permitted to worship, albeit in what he considered less than ideal conditions. During his deposition, Ward testified as follows:

> A. There wasn't any Jewish services at Groveland Correctional Facility until the year 2004 when I brought it to Mr.—to Reverend Carmona's attention and questioned him why was it or why we weren't having any services—

Q. Okay.

A. —in the year of—March of 2004.

Q. And did worship services begin after that?

A. About a month or so after that, yes, they did begin.

(Ward Dep. 11:11–20.) Once they began, Jewish services were held once per week. The services were led by Jewish or Israelite inmates and, although when services began, Torahs were not available, they arrived two months later. (Ward Dep. 14:24–15:13.) Significantly, the purchase of the Torahs was made from Groveland's funds, not the inmates'.

Ward also complains that the Jewish services were held "in a church." At his deposition, he testified that the services, "weren't held in an area that was sacred to my religious beliefs as well as my fellow brothers. There was [sic] crosses, there was Catholic material…It should have been covered. There was [sic] Bibles always in there, Bibles should not have been there, they were never covered." (Ward Dep. 16:5–13.) He further stated that on numerous occasions he asked for the Bibles to be removed before Jewish services (*id*. 14–16), but they were not (*id.* 17:16–17), nor were the religious symbols about which he complained covered (*id*. 17:22–25). Moreover, Ward testified that Jewish inmates were not permitted to have a study group, because of a lack of space. (Ward Dep. 20:5, 20:24–25.)

Turning to the provision of religious materials, the Court can find no precedent that required DOCS to furnish a Torah, or other religious materials. However, beyond this point, Ward contends that Defendant Gilbert prevented him from bringing his own Torah to

worship services:

> 18. In addition to Defendants' disregard for our rights, on the occasions when Plaintiffs had to attend worship services, we suffered harassment and undue scrutiny from Defendant Gilbert, who would inspect our religious materials before our services, and harassed us and restricted the religious materials we were allowed to bring into the services. For example, he withheld my Torah and other religious materials despite the fact that he had no actual authority or basis to determine which materials were religious in nature and required for the worship services, and which were not. Furthermore, he threatened that if I were to bring my Torah to the worship services ever again, he would issue me a misbehavior report. In addition to my own religious materials, he withheld similar materials from other Jewish inmates. He acted thusly not in accordance with any facility policy, but arbitrarily, under the purported direction of his supervising officer. (Gilbert Depo. Transcript, at p. 176).

(Ward Aff. ¶ 18.) He testified similarly. (Ward Dep. 21:6–18.)

The Court finds the *Ward* case from the Ninth Circuit, cited above, particularly helpful in deciding the motion. There, the "prison, however, in no way restricts [the plaintiff's] ability to contact a rabbi on his own to come into the prison, nor does it forbid rabbis from coming into the prison." *Ward*, 1 F.3d at 880. In contrast, however, the evidentiary proof indicates that DOCS prohibits Ward from contacting rabbis on his own in an attempt to obtain one for worship services more frequently that those that do come now. Further, a material question of fact is presented since Ward has stated that he is prohibited from taking his Torah, and other prisoners' religious materials, into the lay worship services. Viewing the evidence in the light most favorable to the non-moving parties, if Ward's contention is accurate, than it would appear that Defendants have prevented Jewish inmates from having materials necessary to their worship. Accordingly, summary judgment on this ground, reasonable accommodation, is precluded.

**CONCLUSION**

For all of the foregoing reasons, Defendants' application for summary judgment

([Docket No. 103](#)) is denied.

SO ORDERED.

Dated:     July 30, 2010
             Rochester, New York

             ENTER:

                                         /s/ Charles J. Siragusa
                                         CHARLES J. SIRAGUSA
                                         United States District Judge